# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**IRENE CHRISTINE FINZEL,**
    **Plaintiff,**

    v.                                                       Case No. 15-C-98

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social Security Administration**
    **Defendant.**

## DECISION AND ORDER

Plaintiff Irene Finzel applied for social security disability benefits, claiming that she could no longer work due to a variety of impairments, including fibromyalgia, autonomic dysfunction, neuropathy, and depression. The Administrative Law Judge ("ALJ") assigned to the case concluded that plaintiff could, despite her limitations, still perform a range of light, unskilled, low stress work. In this action for judicial review, plaintiff argues that the ALJ failed to properly account for all of her mental limitations. I agree and thus remand for further proceedings.

## I. FACTS AND BACKGROUND[1]

In her April 2010 application and supporting materials, plaintiff reported employment as a truck and bus driver until March 5, 2010, when she stopped working due to her conditions. (Tr. at 257, 300-01, 319.) In a function report, plaintiff described variable concentration, annoyance with people, and avoidance of social activities. (Tr. at 315.) However, she indicated that she usually got along with authority figures okay and denied being fired from a

---

[1]Because plaintiff does not challenge the ALJ's findings regarding her physical abilities, I focus on the evidence related to her mental status.

job because of problems getting along with others. (Tr. at 316.)

During an August 10, 2010 consultative psychological evaluation with Donald Meyer, Ph.D., plaintiff advised that she had been fired from previous jobs because of her "attitude," and Dr. Meyer noted that while plaintiff was generally cooperative she did display "some underlying irritability." (Tr. at 676.) Dr. Meyer found that plaintiff appeared "to have significant depression, attention deficit issues with impulsiveness and short-tempered, irritability, she will jump from one subject to another and is teased by her children as having attention problems because of jumping from one subject to another." (Tr. at 678.) Dr. Meyer diagnosed major depressive disorder, recurrent, attention deficit disorder, rule out bipolar affective disorder, with a current GAF of 40 (highest in the past year of 75).[2] Regarding plaintiff's work capacity, Dr. Meyer concluded:

> [Plaintiff] is capable of understanding, remembering, and carrying out simple instructions. She has an attitude by history and has been terminated because of it. She is quite irritable during this interview, yet frequently laughed and was cooperative throughout despite the underlying agitation. She appears able to concentrate well enough to complete task[s] one-on-one. Overall impression was she was a safe bus driver yet . . . interpersonally with her supervisors, she got frustrated easily and upset with them.

(Tr. at 678.)

On August 23, 2010, psychological consultant Esther Lefevre, Ph.D, completed a

---

[2]GAF ("Global Assessment of Functioning") rates the severity of a person's symptoms and her overall level of functioning. Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a persistent danger of hurting herself or others. Scores of 81-90 reflect "minimal" symptoms, 71-80 "transient" symptoms, 61-70 "mild" symptoms, 51-60 "moderate" symptoms, 41-50 "severe" symptoms, 31-40 some impairment in reality testing or major impairment in several areas, 21-30 behavior considerably influenced by delusions or hallucinations, and 11-20 some danger of hurting self or others. Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32-34 (4th ed. 2000).

2

psychiatric review technique report, finding that plaintiff experienced mild restrictions of activities of daily living; marked difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, and pace ("CPP"). (Tr. at 698.) In an accompanying mental residual functional capacity ("MRFC") report, Dr. Lefevre found plaintiff moderately limited in her ability to understand, remember, and carry out detailed instructions, and get along with co-workers; and markedly impaired in her ability to interact appropriately with the general public, and in her ability to accept instructions and respond appropriately to criticism from supervisors. (Tr. at 702-03.) In the narrative portion of the report, Dr. Lefevre opined that plaintiff "retains the ability to perform the basic mental demands of unskilled work, though she should have limited contact with supervisors and co-workers." (Tr. at 704.)

On April 11, 2011, a second consultant, Roger Rattan, Ph.D., completed a psychiatric review technique report, finding mild restriction of activities of daily living, moderate difficulties in social functioning, and moderate difficulties in CPP. (Tr. at 754.) In his MRFC report, Dr. Rattan found plaintiff moderately limited in her ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with others without being distracted by them, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers, and respond appropriately to changes in the work setting. (Tr. at 758-59.) In the narrative portion of the report, Dr. Rattan also opined that plaintiff "maintain[ed] the ability to sustain unskilled work." (Tr. at 760.)

The Social Security Administration denied plaintiff's application initially and on reconsideration (Tr. at 101-04, 154-80), so plaintiff requested a hearing (Tr. at 181), appearing before an ALJ on March 14, 2012 (Tr. at 72). Plaintiff testified that she took anti-depressants

3

and did talk therapy, which helped. (Tr. at 89-90.) She indicated that she had trouble getting along with some people – the "stupid ones I just want to choke" – but the majority of people she could "deal with or stomach." (Tr. at 90.) She said: "I just try to clear up business as fast as possible with them so I can get away from them." (Tr. at 91.)

On April 26, 2012, the ALJ issued an unfavorable decision. (Tr. at 108-19.) Plaintiff requested review by the Appeal Council, and on July 10, 2013, the Council remanded the case, directing the ALJ to re-evaluate plaintiff's mental impairments, particularly her deficiencies in CPP. (Tr. at 125-28.)

On October 17, 2013, plaintiff appeared for her hearing on remand. Plaintiff testified that she basically stayed in the house, just talking to her kids' teachers and the upstairs neighbor occasionally. (Tr. at 54-55.) She also related anger that "comes out of nowhere," rooted in exhaustion and pain. (Tr. at 55.) She indicated that her depression medication was recently upped, and she was doing better on that, not crying hysterically all the time and not feeling like jumping off a bridge anymore. (Tr. at 55.) However, she cried at the hearing, stating: "I do this sometimes when I get really stressed out and my anxiety is through the roof right now. And it's either get up and run or stay and cry." (Tr. at 57.) She described her memory as "[s]hady at best." (Tr. at 57.)

The ALJ asked a vocational expert ("VE") to assume a hypothetical person of plaintiff's age, education, and work experience, capable of a range of unskilled, light work; limited to a low stress job, defined as requiring only occasional decision making and only occasional changes in the work setting; only occasional interaction with co-workers and supervisors; and who would be off task up to 10% of the workday, in addition to regular breaks. The VE testified that such a person could work as an officer helper, mail clerk, and checker in a warehouse.

(Tr. at 61-63.) If the person were off task more than 10% of the day, that would eliminate all jobs. (Tr. at 65.)

On December 3, 2013, the ALJ again issued an unfavorable decision. (Tr. at 130.) The ALJ found that plaintiff suffered from a number of severe impairments, including fibromyalgia, autonomic dysfunction, neuropathy, and depressive disorder, none of which qualified as conclusively disabling under the agency's Listings. (Tr. at 135-36.) In specifically considering plaintiff's mental impairment under the Listings, the ALJ found mild restriction of activities of daily living, moderate difficulties in social functioning, and moderate difficulties in CPP. (Tr. at 137-38.) Regarding CPP, the ALJ noted plaintiff's testimony that her memory was "shady at best" and her previous reports that she was at times unable to comprehend directions. (Tr. at 137.) However, the consultative examiner, Dr. Meyer, found plaintiff's immediate, recent, and remote memory intact, and she had no difficulty following their conversation. The ALJ further noted that plaintiff's concentration problems had not been so great as to prevent her from caring for and maintaining a schedule for her young sons or driving a vehicle. (Tr. at 138.)

In reaching these conclusions, the ALJ afforded significant weight to Dr. Rattan's April 2011 report. The ALJ noted Dr. Lefevre's finding that plaintiff had a marked impairment in social functioning but found that the evidence did not support that degree of limitation. In support of her finding, Dr. Lefevre cited plaintiff's history of "attitude" at work, resulting in negative consequences including interpersonal difficulties with supervisors. However, the ALJ found this questionable, as plaintiff initially denied that these difficulties resulted in her termination from employment. Further, Dr. Meyer noted that while plaintiff exhibited an underlying irritability, she was nevertheless cooperative and had good expressive communication skills, which suggested that she was able to modify her behavior when

5

necessary. Finally, the ALJ found plaintiff's conservative and infrequent mental health treatment inconsistent with a marked limitation in any domain of functioning. (Tr. at 138.)

The ALJ next determined that plaintiff retained the RFC to perform unskilled, light work allowing for an at-will sit/stand option, with occasional postural movements. Mentally, he limited her to low stress jobs, defined as having only occasional decision making and changes in the work setting, with only occasional interaction with co-workers and supervisors, and allowing her to be off task up to 10% of the day in addition to regularly scheduled breaks. (Tr. at 139.)

In making his mental RFC finding, the ALJ noted that plaintiff's depression appeared to be episodic, triggered by family stressors, rather than continuous; that her mental health treatment had been intermittent, with her therapist assessing her functioning as only mildly or moderately impaired; and that plaintiff testified her depression improved with medication. The ALJ also noted Dr. Meyer's finding that plaintiff was cooperative despite underlying irritability, with no difficulty following conversation and the ability to follow a three-step command correctly. (Tr. at 142.)

The ALJ gave partial weight to the reports of the psychological consultants, Drs. Rattan and Lefevre, who opined that plaintiff retained the ability to perform the basic mental demands of unskilled work. The ALJ did not accept Dr. Lefevre's opinion of marked limitations in plaintiff's ability to interact appropriately with the public and accept instructions and respond appropriately to criticism from supervisors. The ALJ found this limitation unsupported by the record, which reflected that plaintiff was consistently appropriate when engaging with treating and examining professionals. Insofar as the record documented plaintiff's report of conflict with supervisors, the ALJ found that Dr. Lefevre's opinion was accounted for in the RFC restricting

6

plaintiff to only occasional contact. (Tr. at 144.) The ALJ found these opinions largely consistent with Dr. Meyer's report, in which Dr. Meyer found plaintiff capable of understanding, remembering, and carrying out simple instructions. (Tr. at 144.)[3]

The ALJ found that this RFC precluded plaintiff's past work as a bus and truck driver, but the VE was able to identify other jobs plaintiff could do, including office helper, mail clerk, and checker. (Tr. at 145-46.) The ALJ accordingly found her not disabled. (Tr. at 146-47.)

Plaintiff again sought review by the Appeals Council, but on November 28, 2014, the Council denied the request. (Tr. at 1.) This action followed.

## II. DISCUSSION

The ALJ must in both his hypothetical posed to the VE and in the RFC assessment incorporate all of the claimant's limitations supported by the medical evidence. Varga v. Colvin, No. 14-2122, 2015 U.S. App. LEXIS 12780, at *9 (7th Cir. July 24, 2015) (citing Yurt v. Colvin, 758 F.3d 850, 857 (7th Cir. 2014); O'Connor-Spinner v. Astrue, 627 F.3d 614, 619 (7th Cir. 2010)). "Among the mental limitations that the VE must consider are deficiencies of concentration, persistence, or pace." Id. at *10 (citing Yurt, 758 F.3d at 857; Stewart v. Astrue, 561 F.3d 679, 684 (7th Cir. 2009)).

The Seventh Circuit has held that the most effective way to ensure that the VE is fully apprised of the claimant's limitations is to include all of them directly in the hypothetical. O'Connor-Spinner, 627 F.3d at 619. While the court has not adopted a per se requirement that the specific terminology "concentration, persistence, and pace" always be used in the

---

[3] Dr. Meyer assigned a GAF score of 40, indicative of serious impairment in functioning, but the ALJ noted that his exam occurred at a time when plaintiff was not engaged in counseling, something plaintiff testified she found helpful. (Tr. at 144-45.) The ALJ also found the score inconsistent with Dr. Meyer's contemporaneous observations. (Tr. at 145.)

7

hypothetical, the court has generally concluded that merely limiting the claimant to "simple, routine, repetitive" tasks will fail to account for limitations in CPP. Id. at 619-20;[4] see also Yurt, 758 F.3d at 858-59 ("[W]e have repeatedly rejected the notion that a hypothetical like the one here confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace.").

In the present case, the ALJ found that plaintiff experienced moderate difficulties in maintaining CPP (Tr. at 137), crediting Dr. Rattan's psychiatric review technique report on this issue (Tr. at 138, 754). In his accompanying MRFC report, Dr. Rattan more specifically found plaintiff moderately limited in her ability to (1) understand and remember detailed instructions, (2) carry out detailed instructions, (3) maintain attention and concentration for extended periods, (4) work in coordination with others without being distracted by them, (5) accept instructions and respond appropriately to criticism from supervisors, (6) get along with co-workers, and (7) respond appropriately to changes in the work setting. (Tr. at 758-59.) In formulating RFC, the ALJ limited plaintiff to unskilled, low stress jobs (defined as having only occasional decision making and changes in the work setting), only occasional interaction with co-workers and supervisors, and off task up to 10% of the day in addition to regularly scheduled breaks (Tr. at 139);[5] he included these same limitations in his questions to the VE (Tr. at 61-62). The ALJ did not specifically refer to plaintiff's ability to concentrate in

---

[4]This is so because the ability to learn how to do a task of given complexity is not the same thing as the ability to stick with that task over a sustained period. Id. at 620.

[5]On this issue, the ALJ gave "partial weight" to the consultants' reports, crediting their opinions that plaintiff retained the ability to perform unskilled work but rejecting Dr. Lefevre's opinion regarding social functioning. (Tr. at 144.)

8

questioning the VE; nor did he specifically include in the hypothetical or RFC the seven moderate limitations from Dr. Rattan's MRFC report. (Tr. at 759.) Plaintiff argues that this violated the general rule set forth in O'Connor-Spinner and like cases.

The Commissioner responds that Yurt and O'Connor-Spinner are distinguishable because, in addition to unskilled work involving only occasional contact with others, the ALJ further limited plaintiff to low stress jobs and allowed her to be off task up to 10% of the day. In Varga, which came down after the Commissioner filed her brief in this case, the Seventh Circuit rejected a similar argument. In that case, the same Dr. Rattan found the claimant moderately limited in seven areas related to concentration, persistence, and pace:

> (1) understanding and remembering detailed instructions; (2) carrying out detailed instruction[s]; (3) maintaining attention and concentration for extended periods; (4) completing a normal workweek without interruption from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; (5) accepting instructions and responding appropriately to criticism from supervisors; (6) getting along with coworkers without distracting them or exhibiting behavioral extremes; and (7) responding appropriately to changes in the work setting.

2015 U.S. App. LEXIS 12780, at *11.[6] The ALJ accepted Dr. Rattan's assessment of the claimant's mental state, but the hypothetical and RFC failed to include these moderate limitations. Id. at *11-12. Instead, the ALJ found the claimant "limited to simple, routine, and repetitive tasks in a work environment free of fast paced production requirements, involving only simple, work-related decisions with few if any work place [sic] changes." Id. at *7-8. The court found that adding restrictions regarding work-related decisions, work-place changes, and interactions with others did not solve the problem, as these limitations primarily addressed

---

[6] Dr. Rattan endorsed the same limitations in this case, except for number 4; instead, he found plaintiff moderately limited in her ability to work in coordination with others without being distracted by them. (Tr. at 758.)

9

workplace adaptation, rather than concentration, pace, or persistence. Id. at *12-14.

The only difference between the present case and Varga is that here the ALJ allowed plaintiff to be off-task up to 10% of the workday. This limitation does appear to more directly address CPP,[7] but the ALJ failed to explain how he came up with the percentage, which happens to correspond to the maximum off-task time an employer would tolerate. (Tr. at 65.) In Rapp v. Colvin, No. 12-cv-353, 2015 U.S. Dist. LEXIS 34106, at *13 (W.D. Wis. Mar. 19, 2015), the court rejected an attempt to account for CPP deficiencies with a 10% off-task limitation where the ALJ cited no medical evidence and offered no explanation for it. Id. at *15-16. "[G]iven the ALJ's silence and the minimal record, it cannot be said that Rapp was any more or less likely to be off-task 10% of the day than being off-task for 50% of the day." Id. at *17; see also Bochat v. Colvin, No. 15-C-34, 2015 U.S. Dist. LEXIS 96227, at *31 (E.D. Wis. July 23, 2015). The same is true in the present case. To the extent that a time-off-task limitation could account for CPP deficiencies under the O'Connor-Spinner line of cases, the ALJ must explain the basis for his conclusion.

Plaintiff further argues that the ALJ failed to account for her deficits in social functioning. As indicated above, the ALJ found plaintiff moderately limited in social functioning, crediting Dr. Rattan's report. The ALJ discounted Dr. Lefevre's finding of marked limitations in this area, finding them inconsistent with plaintiff's function report, in which she denied that interpersonal difficulties resulted in her termination from employment; with Dr. Meyer's finding that, while plaintiff exhibited an underlying irritability, she was nevertheless cooperative and had good

---

[7]As plaintiff notes, however, in the hypothetical the ALJ said the person needed to be off-task 10% of the day "for any reason or combination of reasons." (Tr. at 62.) He did not specifically attribute this limitation to mental impairments.

10

expressive communication skills; and with plaintiff's conservative and infrequent mental health treatment, and appropriate behavior when engaging with examining professionals. (Tr. at 138, 144.) The ALJ concluded that the RFC accounted for any documented problems in personal interaction by restricting plaintiff to only occasional contact with co-workers and supervisors. (Tr. at 144.)

The ALJ is required to incorporate into his hypothetical only those limitations that he accepts as credible, Schmidt v. Astrue, 496 F.3d 833, 846 (7th Cir. 2007), and the ALJ provided a reasoned explanation for rejecting this aspect of Dr. Lefevre's opinion, see, e.g., McKinzey v. Astrue, 641 F.3d 884, 891 (7th Cir. 2011) (noting that the ALJ must explain the weight given state agency consultant opinions). In challenging the ALJ's finding, plaintiff notes Dr. Meyer's statements that she "has an attitude by history and has been terminated because of it," that she was "quite irritable during this interview," and that she "got frustrated easily and upset" with supervisors. (Tr. at 678.) The ALJ acknowledged these statements but, as discussed, found the claim that plaintiff had been terminated due to her attitude contrary to the statement in plaintiff's own function report. The ALJ also credited Dr. Meyer's finding that, despite her irritation, plaintiff was able to cooperate with the exam. It is not the role of the court on judicial review to re-weigh the evidence or substitute its judgment for the ALJ's. Pepper v. Colvin, 712 F.3d 351, 362 (7th Cir. 2013).

Plaintiff further contends that, contrary to the ALJ's statement that she acted appropriately with examining professionals, her treating sources repeatedly questioned her judgment, citing records from therapist Edward Dehnert, nurse practitioner Mary Yellick, primary care physician Dr. Brett Linzer, and neurologist Dr. Audrey Jantzen. The ALJ considered much of this evidence (Tr. at 140), noting that plaintiff received only intermittent

11

mental health treatment, that Mr. Dehnert generally found only mild to moderate impairment, and that plaintiff's symptoms improved with the medications prescribed by her primary doctor (Tr. at 142). See, e.g., Rice v. Barnhart, 384 F.3d 363, 371 (7th Cir. 2004) (noting that the ALJ need not specifically discuss every piece of evidence but need only minimally articulate his reasons and make a bridge between the evidence and the outcome). The ALJ also considered NP Yellick's report, rejecting her opinion that plaintiff's symptoms would frequently interfere with performance of simple work tasks. To the extent that NP Yellick further opined that plaintiff would have difficulty engaging in complex tasks that require judgment, the ALJ found that concern accommodated in the RFC. (Tr. at 144.) Plaintiff does not challenge the ALJ's evaluation of the Yellick report.

Plaintiff also faults the ALJ for giving significant weight to Dr. Rattan's opinion that she experienced moderate, rather than marked, limitations in social functioning, arguing that Dr. Rattan failed to specifically discuss Dr. Meyer's comments regarding plaintiff's ability to get along with others. However, Dr. Rattan did consider Dr. Meyer's report and conclusions, giving them great weight. (Tr. at 760.) In any event, I review the ALJ's decision, not Dr. Rattan's report, and the ALJ considered Dr. Meyer's pertinent statements regarding social functioning.

Finally, plaintiff complains that the ALJ's RFC for occasional contact with supervisors does not address her negative attitude regarding instruction and criticism on those occasions when contact would occur. The Seventh Circuit has noted that limiting interactions with others will not necessarily account for a claimant's "temperamental deficiencies." See Yurt, 758 F.3d at 758-59. The ALJ must on remand ensure that any such deficiencies he accepts, including those endorsed by Dr. Rattan, are accounted for in the hypothetical and RFC.

12

## III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **REVERSED**, and this matter is **REMANDED** to the Commissioner for further proceedings consistent with this decision. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 14th day of August, 2015.

/s Lynn Adelman
LYNN ADELMAN
District Judge